IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KARL BRETT LLOYD,   )
         )
    Plaintiff,  )
         )
    v.    )   Civil Action No. 05-802
         )
WASHINGTON & JEFFERSON )   Judge McVerry
COLLEGE,     )   Magistrate Judge Hay
         )
    Defendant. )

REPORT AND RECOMMENDATION

I.  RECOMMENDATION

    It is respectfully recommended that the district court grant the motion for

summary judgment submitted on behalf of the Defendant and deny the motion for partial

summary judgment submitted on behalf of the Plaintiff.

II.  REPORT

    Plaintiff Karl Brett Lloyd ("Plaintiff"), a former professor at Washington &

Jefferson College ("W&J" or "College" or "Defendant"), alleges that W&J unlawfully

discriminated against him and/or retaliated against him in violation of the Americans with

Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the Family Medical Leave Act, 29 U.S.C. §

2601 et seq. ("FMLA"), and the Pennsylvania Human Relations Act, 43 Pa.Stat. § 951, et seq.

("PHRA"), and asserts a state law breach of contract action.   Presently before the court for

disposition is a motion for summary judgment submitted on behalf of the Defendant and a

motion for partial summary judgment submitted on behalf of the Plaintiff.   For the reasons that

follow, Defendant's motion should be granted and Plaintiff's motion should be denied.

### A.    Factual Background

Plaintiff suffers from severe anxiety and depression, agoraphobia[1] with recurrent

panic attacks[2], fibromyalgia and chronic fatigue, and irritable bowel syndrome.  Amended

Complaint, ¶ 7 (Doc. 15).

W&J hired Plaintiff as an Associate Professor in the Information Technology

Leadership ("ITL") Department effective July 1, 2002.  Defendant's Statement of Facts ("SOF"),

¶ 1 (Doc. 28); Plaintiff's Counter Statement of Facts ("CSOF"), ¶ 1 (Doc. 37).  Plaintiff did not

disclose his medical condition(s) at the time he was hired.  CSOF, ¶ 7.

As an Associate Professor, Plaintiff's responsibilities included teaching up to

seven courses annually as assigned by the Chair of the department, preparing for classes,

mentoring students, holding regular office hours, attending departmental and faculty meetings,

developing new courses, conducting research and writing, and participating in recruitment

activities and in the intellectual, cultural and social life of the College.  Lloyd Dep., Exh. 4.

W&J hired Plaintiff on a shortened tenure track, i.e., three years instead of the usual six.

Amended Complaint, ¶ 15.

Prior to his start date, Plaintiff sent an e-mail to Dr. James Dlugos ("Dlugos"),

then Vice President and Dean of Academic Affairs, setting forth Lloyd's "expected schedule and

contributions," which proposed his physical presence on campus three days per week "with

---

[1]    "**Agoraphobia** is anxiety about, or avoidance of, places or situations from which escape
might be difficult (or embarrassing) or in which help may not be available in the event of
having a Panic Attack or panic-like symptoms."  Diagnostic and Statistical Manual of
Mental Disorders, Fourth Edition, Text Revision, p. 429.  Washington, DC, American
Psychiatric Association, 2000.

[2]    "A **Panic Attack** is a discrete period in which there is the sudden onset of intense
apprehension, fearfulness, or terror, often associated with feelings of impending doom.
During these attacks, symptoms such as shortness of breath, palpitations, chest pain or
discomfort, choking or smothering sensations, and fear of 'going crazy' or losing control
are present."  Id.

2

additional days (fourth, fifth, etc.) added as needed for specific ad-hoc needs such as advising, collaboration ... etc." Lloyd Dep., Exh. 2. Plaintiff suggested an average of twenty-four to thirty hours to be spent on campus and an additional twenty-five to forty hours per week "at home and/or on the road in activities such as development, self-training, and course related activities." Id. Plaintiff did not inform W&J that his request for a reduced presence on campus was related to his medical condition(s). Id.

At the conclusion of Plaintiff's first year, Dr. Charles Hannon ("Hannon"), Chair of the ITL Department, rated Plaintiff's performance as excellent. Deposition of Charles Hannon ("Hannon Dep."), Exh. 6. W&J reappointed Plaintiff to the faculty for a second year. Hannon Dep., Exh. 3.

During Plaintiff's first-year performance review, Hannon suggested that Plaintiff should make further efforts to be more "visible" on campus. Hannon Dep., Exh. 6. According to Hannon, his concern in this regard stemmed from Plaintiff's practice of being on campus for his classes and for little other time, resulting in fewer opportunities for Plaintiff to advance the mission of the ITL department and to become better known to other faculty who would be making recommendations concerning Plaintiff's tenure. Hannon Dep., p. 54 and Exh. 9. Plaintiff responded with a listing of projects and activities he had engaged in during the course of the year and asked for some guidance from Hannon, noting that with Plaintiff's current schedule and responsibilities he was not "currently able to find time for increasing my presence more than the current level without giving up other responsibilities." Lloyd Dep., Exh. 8. Plaintiff did not indicate that his health problems affected his ability to spend more than three days per week on campus. Id.

In April of 2003, Hannon instituted a policy for all full-time ITL faculty requiring that "they be on campus a minimum of four days per week, for at least four hours per day, in

3

addition to attending a fair share of weekend functions that require faculty representation."
Hannon Dep., Exh. 7.

Later, Plaintiff engaged Dean Dlugos and the President of W&J in discussions concerning, *inter alia*, the "visibility" issue raised by Hannon, his new policy for on-campus presence, and Plaintiff's inability to spend a fourth day per week on campus "simply for 'face time'" given his other activities and commitments. Lloyd Dep., Exh. 13. In an e-mail to President Mitchell, Plaintiff listed "a brief summary of only the most central items" of a previous discussion between them. Id. Plaintiff did not mention his health as one of the "most central items" or otherwise. Id.

Sometime in the fall of 2003, it appears that Plaintiff discussed with Hannon pursuing medical leave for the January Intersession due to leg pain that Plaintiff stated was exacerbating other unspecified difficulties. Lloyd Dep., Exh. 17.

At about this same time, Plaintiff submitted a Request for Family Medical Leave Absence, dated November 21, 2003, to Margaret Gorman ("Gorman"), Director of Human Resources ("HR"), requesting medical leave during the Intersession (January 2004) due to his medical condition(s). Deposition of Margaret Gorman ("Gorman Dep."), Exh. 12. He submitted a medical certificate, signed by his physician, Dr. Ramesh Khurana, dated November 18, 2003. Lloyd Dep., Exh. 16. Dr. Khurana listed his diagnoses, to include: (1) severe anxiety and depression with stress, (2) chronic fatigue with stress and profound sensitivity syndrome, and (3) neurodermatitis with stress. Id. He recommended that Plaintiff be off work for a month for recuperation and desensitization. Id. W&J granted Plaintiff's request for Family Medical Leave during the Intersession, from January 8, 2004 through January 30, 2004, for a total of seventeen work days. Id.; Affidavit of Margaret Gorman ("Gorman Aff.), Exh. 1 (Doc. 29-4).

4

On January 9, 2004, Plaintiff advised the College that, according to his physicians, stress was the primary factor contributing to his lengthy illness and that he must resolve the stress "or move on."  Lloyd Dep., Exh. 25.  He added, "if [Hannon] remains in a position to create great stress as Chair of the department, I will be required, medically, to discuss my departure."  Id.  Plaintiff concluded with a request to meet to discuss this issue as well as criticisms of Hannon.  Id.

In response, Dlugos met with Plaintiff, Hannon and Gorman on January 21, 2004. According to Gorman's notes of this meeting, Dean Dlugos explained that Hannon was not going to be replaced as Chair of the ITL Department.  Dlugos also told Plaintiff to hold Tuesday afternoons open for meetings.  Dlugos commended Plaintiff's volunteer work with other faculty and departments but emphasized that his first priority should be availability to his department and students.  Plaintiff responded that he had medical appointments on Tuesdays and Thursdays and could give the Department four Tuesdays during the Spring term.  Plaintiff did not indicate that his health would negatively impact his ability to perform the functions of his teaching position during the Spring semester or would otherwise limit him.  Lloyd Dep., Exh. 27.

On January 27, 2004, Plaintiff wrote to his physician, Dr. Gary Johnson, seeking his support for Plaintiff to take medical leave for the Spring semester due to Plaintiff's "continuing severe fatigue and pain."  Lloyd Dep., Exh. 28.  Plaintiff indicated that he planned to use the medical leave in an attempt to regain his strength and "to also further consider a new profession in technical writing."  Id.  Plaintiff then submitted form medical certificates for family medical leave from Dr. Johnson and Dr. Khurana, who recommended that Plaintiff be given sick leave for the entire Spring 2004 semester for treatment of fibromyalgia, irritable bowel syndrome, severe fatigue, severe anxiety with depression, and profound sensitivity syndrome with inability to cope with chronic stress.  Gorman Dep., Exhs. 15 & 16.

5

HR advised Plaintiff on February 3, 2004, that it had received the physicians' forms for family medical leave.  However, HR also advised Plaintiff that he needed to notify HR in writing that he was requesting this leave and to submit the physicians' certifications on the Department of Labor ("DOL") forms that the College was then using.  Gorman Dep., Exh. 14.

Plaintiff's Spring term classes were re-assigned to other faculty members. Gorman Dep., Exh. 26.  Thereafter, Gorman advised Plaintiff that the Dean was exploring a solution that would have Plaintiff report to someone other than Hannon, which Plaintiff agreed "would suffice for now ... would remove me from the clear stressful intentions of [Hannon]." Lloyd Dep., Exh. 31.

On February 6, 2004, Plaintiff met with Dlugos and Gorman.   The Dean advised that Plaintiff would be temporarily transferred to a non-teaching position in the Information Technology Services ("ITS") Department assisting the ITS Director, Daniel Faulk ("Faulk"). The Dean also altered Plaintiff's tenure track given the temporary transfer.  Dlugos indicated that Plaintiff's new schedule would require his presence on campus five days per week.   Plaintiff mentioned that he had scheduled medical appointments on Tuesdays and Thursdays and the Dean indicated that those appointments were not a problem --  Plaintiff could report to work before or after his appointments.  Plaintiff did not indicate that his medical condition(s) would affect his ability to perform the duties of this temporary position.  Gorman Dep., Exh. 26.

On February 9, 2004, Plaintiff submitted a written request for accommodation under the ADA, seeking "a three day on campus work/teaching schedule with all other work/teaching (on and off campus) to be determined at my discretion as I work to schedule and fulfill other college duties and work."  Lloyd Dep., Exh. 33.

On February 10, 2004, Plaintiff e-mailed Gorman that his medical problems were directly related to his work environment under Hannon and that his attacks had become severe

and disabling due to work stress.  He indicated that he was reporting for work in the ITS

Department against medical advice and that he would continue to work there until he was either

"placed in a structure in which I can teach and report to someone outside of ITL in order to

attempt [to] be at work without the work stress" or until he was placed on medical leave for the

balance of the Spring term.  He also requested to be returned to the shortened tenure track.

Deposition of James Dlugos ("Dlugos Dep."), Exh. 36.

On February 12, 2004, Gorman wrote to Plaintiff indicating that his "refusal to

work the five day week is unacceptable.  The College expects you to report to Mr. Faulk on

Monday, February 16, 2004 or we will consider you to have voluntarily resigned your position."

Gorman Dep., Exh. 29.

Plaintiff sent a written request for family medical leave, dated February 17, 2004,

with the requisite DOL physicians' certificates.  Gorman Dep., Exhs. 17, 19 & 20.

Gorman wrote to Plaintiff on February 19, 2004, in response to his February 9,

2004 request for accommodation.  She summarized Plaintiff's "seemingly changing needs."  In

part, she referenced his February 9th request for accommodation which appeared to suggest that

Plaintiff was able to work but not for more than three days per week.  Gorman advised Plaintiff

that the College had scheduled an appointment for him with Dr. George Schmieler, Washington

Hospital Occupational Medicine, to determine Plaintiff's ability to work.  Lloyd Dep., Exh. 34.

Dr. Schmieler examined Plaintiff on March 5, 2004.  In his report of the

examination, he noted Plaintiff's reported history of agoraphobia, panic attacks, stress, anxiety

and fatigue spanning some twenty years.  Dr. Schmieler concluded his report with the following

notation: "Dr. Lloyd indicated today that he feels he would be able to resume his previous

schedule of working three days a week, but does not feel capable of working five days a week on

a regular basis.  If that accommodation is unable to be granted then it is reasonable for him to be given consideration for an extended leave."  Gorman Dep., Exh. 30.

By letter dated March 19, 2004, the College denied Plaintiff's request to return to teaching with a three day on-campus schedule.  Instead, the College agreed to permit Plaintiff to work in the administrative ITS position on the Monday-Wednesday-Friday schedule he had requested.  The College asked Plaintiff to respond to the offer by March 24, 2004; otherwise the College would consider Plaintiff to be resigning his position.  Lloyd Dep., Exh. 40.

Thereafter, on March 23, 2004, Plaintiff wrote to Dr. Schmieler asking that he write a letter to the College clarifying that Lloyd's statements to the doctor were that Lloyd could work full time but with only three on-campus days and the remainder of the week working from home.  Plaintiff concluded his request by stating, "I desperately need to be on short-term medical if they cannot do this."  Defendant's Response to Counter Statement of Facts in Opposition to Defendant's Motion for Summary Judgment, Exh. 2 (Doc. 45).

On March 29, 2004, Plaintiff wrote to Gorman and Dlugos rejecting the offer to work Monday-Wednesday-Friday in the ITS Department.  Plaintiff noted that he had been working diligently in his ITS position, including weekends.  Further, he reported that he had been working on course development, doing research and writing, and had taught a workshop for the College's Office of Life Learning.  He indicated that his choice was to continue in his five-day per week position until the end of the Spring term when he expected to be re-instated to his faculty position.  Lloyd Dep., Exh. 39.

In  subsequent correspondence to Dlugos and Gorman, dated March 30, to address what Plaintiff indicated were inaccuracies in the College's March 19th letter, Plaintiff clarified that he was not asking for part-time work, that is, only twenty-four hours per week, but simply

three days on campus with additional days on campus as needed and the balance of his work week to be accomplished from home.  Gorman Dep., Exh. 36.

By letter dated March 31, 2004, the College responded to Plaintiff's March 29th letter, noting certain inconsistencies.  In particular, the College noted Plaintiff's statement that he was rejecting a part-time administrative position and was choosing to work a five-day per week position to be inconsistent with his prior assertions that he could only provide three days per week on campus and to be inconsistent with information from the physicians who had examined him.  Gorman indicated that the College was continuing to offer the Monday-Wednesday-Friday part-time administrative position.  Plaintiff was instructed to report to Faulk on campus on April 5, 2004, at 9:00 a.m., if he accepted the offer;  otherwise, the College would assume Plaintiff was resigning his position effective immediately.  Gorman Dep., Exh. 35.

Plaintiff did not report to Faulk on April 5th at 9:00 a.m.  Instead, he sent an e-mail to Dlugos on April 5, 2004, at 9:54 a.m., with a copy to Faulk and others, indicating that he had therapy that morning and that he "should be in this afternoon (depending on how I am feeling)."  Gorman Dep., Exh. 51.  Plaintiff further remarked that he had chosen to continue in the five-day per week position only out of necessity because his medical leave (for the Spring term) was being denied.  Id.  Plaintiff reiterated that his requested accommodation had always been and remained that he be granted medical leave for the entire Spring term followed by reinstatement to his faculty position.  Id.

Plaintiff did not report to work on April 5th following his therapy and, as a result, the College informed Plaintiff that it considered him to have resigned.  Gorman Dep., Exh. 53.

According to W&J's records, between December 1, 2003 and April 5, 2004, Plaintiff took 14.2 weeks of paid medical leave.  Gorman Aff., Exh. 1 (Doc. 29-4).  During Plaintiff's employment with W&J,  Dr. Khurana treated Plaintiff on four occasions.  Deposition

of Ramesh Khurana, M.D. ("Khurana Dep."), pp. 16-17 .  Dr. Khurana had previously prescribed and Plaintiff took the medication Klonopin "as needed" for his panic attacks.  <u>Id.</u> at pp. 19-20.  According to Dr. Khurana, this medication lowers the amount of adrenaline being produced and "should make [Plaintiff] feel better" during a panic attack.  <u>Id.</u> at p. 20.

 In addition to his work at W&J, Plaintiff served as a councilman for Trafford Borough, where he chaired the Public Safety Committee that oversees the operations of the police department, including budget and grant work.  Lloyd Dep., pp. 4 & 102-103.  He has also done private information technology consulting work on a part-time basis over the past seven plus years.  <u>Id.</u> at p. 6.  He goes to the movies with his wife, attends his son's extracurricular activities and enjoys visiting bookstores.  <u>Id.</u> at p. 74; Deposition of Sarah Mursch, p. 32.  He is a licensed driver and occasionally drives local distances.  Lloyd Dep., pp. 97-102.  Due to his panic attacks, for longer distances his wife drives or accompanies him.  <u>Id.</u>

 **B.**  **Standard of Review**

 Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  <u>Matsushita Elec. Indus. Corp. v.</u>

Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.  Anderson v.

Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

   C.   **Discussion**

      1.   ADA and PHRA Disability Claims[3]

   The ADA prohibits certain employers from discriminating against individuals on

the basis of their disabilities.  42 U.S.C. § 12112(a).  Specifically, the ADA provides that no

covered employer shall discriminate against "a qualified individual with a disability because of

the disability of such individual in regard to job application procedures, the hiring, advancement,

or discharge of employees, employee compensation, job training, and other terms, conditions,

and privileges of employment."  Id.

   Plaintiff claims that W&J discriminated against him on the basis of his alleged

disabilities, i.e., fibromyalgia and panic attack disorder.  More particularly, Plaintiff alleges that

W&J discriminated against him by subjecting him to or threatening him with unwarranted

discipline, by refusing to provide reasonable accommodation and by discharging him because of

his disabilities.[4]

   To establish a *prima facie* case of discrimination under the ADA, a plaintiff must

show (1) he is a disabled person within the meaning of the ADA, (2) he is otherwise qualified to

perform the essential functions of the job, with or without reasonable accommodation by the

employer, and (3) he has suffered an otherwise adverse employment decision as a result of

---

[3]    The Amended Complaint charges disability discrimination under the ADA (Count III)
      and the PHRA (Counts VI).  Because Pennsylvania courts generally interpret the PHRA
      in accordance with its federal counterparts, the disposition of Plaintiff's ADA claim
      applies with equal force to his PHRA claim.  Kelly v. Drexel University, 94 F.3d 102,
      105 (3d Cir. 1996)(PHRA claim is properly treated as coextensive with ADA claim).

[4]    First Amended Complaint at Count III, ¶ 65 (ADA) and Count VI, ¶ 90 (PHRA).

discrimination.  Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 761 (3d

Cir. 2004)(internal citations and quotation marks omitted).  W&J argues that Plaintiff has not and

cannot establish a *prima facie* case of disability discrimination.

First, W&J claims that Plaintiff is not a qualified individual with a disability.  A

"qualified individual with a disability" is identified as "an individual with a disability who, with

or without reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires."  41 U.S.C. § 12111(8).  In turn, a "disability" is

defined as

> **(A)** a physical or mental impairment that substantially limits
> one or more of the major life activities of such individual;
> **(B)** a record of such an impairment; or
> **(C)** being regarded as having such an impairment.

42 U.S.C. § 12102(2).  "[W]hether a person has a disability under the ADA is an individualized

inquiry."  Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999).  Plaintiff contends that he

is disabled because he has an impairment that substantially limits a major life activity.[5]

"The ADA does not define 'substantially limits' but 'substantially' suggests

'considerable' or 'specified to a large degree.' "  Sutton, 527 U.S. at 491.  The courts have

determined that an individual is substantially limited in a major life activity "if he is '[u]nable to

perform a major life activity that the average person in the general population can perform' or is

---

[5]     In his Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. 38),
Plaintiff also asserts that he is disabled because he has a record of an impairment as
evidenced by his receipt of social security benefits from 1985-1998.  As W&J correctly
notes, this claim is unsupportable since a determination of disability by the Social
Security Administration has no collateral estoppel effect because the standards of review
and definitions of disability are completely different from those in the instant case.  See
Howell v. Sam's Club No. 8160/Wal-Mart, 959 F.Supp. 260, 267 (E.D.Pa.
1997))("[R]ecords of disability findings and classifications made in other proceedings do
not necessarily amount to a record of 'impairment' under the ADA."), aff'd mem., 141
F.3d 1153 (3d Cir. 1998); 29 C.F.R. Pt. 1630, App. § 1630.2k (same).

'[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.' " Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996)(quoting 29 C.F.R. § 1630.2(j)); Emory v. Astrazeneca Pharmaceuticals LP., 401 F.3d 174, 179-80 (3d Cir. 2005).  Moderate restrictions or mild limitations are not considered disabilities under the ADA.  Kelly, supra at 106.  "[O]nly extremely limiting disabilities ... qualify for protected status under the ADA." Marinelli v. City of Erie, PA, 216 F.3d 354, 362 (3d Cir. 2000).

Although not entirely clear from his Amended Complaint, Plaintiff appears to claim that he is substantially limited  --  by his panic attacks/agoraphobia  --  in his ability to think and to interact with others.  See Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, pp. 3-7 (Doc. 38).  The ability to think and the ability to interact with others have been recognized by the courts as major life activities under the ADA.  Taylor v. Phoenixville School Dist., 184 F.3d 296, 307 (3d Cir. 1999) (thinking); McAlindin v. County of San Diego, 192 F.3d 1226, 1234-35 (9th Cir. 1999) (interacting with others); Peter v. Lincoln Technical Institute, Inc., 255 F.Supp.2d 417, 432 (E.D.Pa. 2002) (interacting with others).

In evaluating whether an individual is substantially limited it is instructive to look to the EEOC regulations.  Deane v. Pocono Medical Center, 142 F.3d 138, 143 n. 4 (3d Cir. 1998)(en banc)(citing 29 C.F.R. § 1630.2)("Because the ADA does not define many of the pertinent terms, we are guided by the Regulations issued by the Equal Employment Opportunity Commission ("EEOC") to implement Title I of the Act. (citations omitted).").  Section 1630.2 of Title 29, Code of Federal Regulations, provides that the following factors should be considered in determining whether an individual is substantially limited in a major life activity: "(I)  [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment;

13

and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  Further, the effects of any measures being taken to correct or mitigate a physical or mental impairment must be taken into account when judging whether an individual is "substantially limited" in a major life activity and thus disabled under the ADA. Sutton, 527 U.S. at 482.

Here, it is undisputed that Plaintiff has suffered from agoraphobia/panic attacks since 1981.  Merely having this condition, however, does not render Plaintiff disabled for purposes of the ADA.  Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195 (2002).  Plaintiff must establish that this condition substantially limits his ability to engage in one or more major activities of life.  Taylor, 184 F.3d at 306.  Here, Plaintiff has identified  thinking and/or interacting with others as the major activities of life in which he claims to be substantially limited due to his impairments.

As Plaintiff discusses, his agoraphobia/panic attack disorder is a chronic condition brought on by uncomfortable or stressful situations, such as leaving his house or being in crowds or having conflicts or disputes with others.  He indicates that he typically only leaves his house with a family member because it comforts him to know that someone he trusts is close by in case he has an attack.  He acknowledges that these attacks are unpredictable.  He says that an attack can cripple him for hours or even days.  He asserts that he has received almost constant medical

14

intervention since he was diagnosed.[6]  Plaintiff argues that "the extreme and irrational fear" that

he experiences substantially limits his ability to think and to interact with others.[7]

   Plaintiff relies on <u>Taylor</u> to support his claim of being substantially limited in

performing the major life activity of thinking.  In <u>Taylor</u>, the plaintiff suffered from bipolar

disorder.  Hospital records indicated that she became manic and was increasingly aggitated and

psychotic.  She suffered paranoid delusions and ultimately was hospitalized for in-patient

treatment for approximately three weeks.  She was prescribed lithium, which required careful and

frequent monitoring due to potential toxic effects.  She returned to work briefly before she had to

leave work again due to her illness.  She sought psychiatric treatment 25 times throughout the

year.  The Third Circuit determined that episodic conditions if serious enough could limit a major

life activity.  184 F.3d at 309 ("Chronic, episodic conditions can easily limit how well a person

performs an activity as compared to the rest of the population.")

   Plaintiff's case, however, is clearly distinguishable from <u>Taylor</u>.  Plaintiff saw Dr.

Khurana only 14 times in 12 years for treatment of his agoraphobia/panic attacks.  According to

---

[6]   Plaintiff's factual claims are frequently inconsistent and unsupported by the record.  As but one example of these inconsistencies, Plaintiff states that his agoraphobia/panic attack disorder required "constant medical intervention" and, at the same time, "periodic visits" to health care providers.  Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, pp. 3-4 (Doc. 38).  The record evidence is that Plaintiff saw his treating physician, Dr. Khurana, on four occasions during his two year term of employment with W&J.  Khurana Dep., pp. 16-17 (Doc. 37, App. 17).  Additionally, Plaintiff's record citations frequently do not address the factual claim being asserted.  Again, as one of any number of examples, Plaintiff stated he requested a three-day per week teaching schedule when he began working at W&J and in support of this "fact" Plaintiff referenced his Statement of Disputed Material Facts in Opposition to Defendant's Motion for Summary Judgment ("SOF") at paragraphs 185 and 186.  SOF paragraphs 185 and 186 discuss facts relating to W&J's policy concerning termination of faculty members and they say nothing about Plaintiff's requested teaching schedule.  All of this has made review of Plaintiff's claims exceedingly tedious, if not difficult.

[7]   Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, pp. 6-7 (Doc. 38).

Dr. Khurana, when Plaintiff was stressed he would have several appointments with the doctor and then he wouldn't see the Plaintiff for several years.   Plaintiff saw Dr. Khurana on only four occasions during Plaintiff's two-year employment with W&J: November 18, 2003; January 12, 2004; February 17, 2004; and March 9, 2004.  Plaintiff was not hospitalized during his employment with W&J due to his anxiety/attacks.  He takes medication (Klonopin) to manage his symptoms.  Dr. Khurana prescribed the medication to be taken at Plaintiff's own discretion on an as needed basis.  Plaintiff also uses mental imagery and refocusing to control or lessen the severity of his symptoms.  Plaintiff's impairments may well affect his ability to think and interact at times but the evidence clearly demonstrates that these impairments simply do not "substantially limit" his ability to engage in the activities of thinking and interacting with people. Singleton v. Mellon Financial Corp., 2005WL2403722, at * 6 (W.D.Pa. 2005).

During the period of time when he was reportedly severely stressed, i.e., during late January and into the Spring term, Plaintiff nevertheless professed an ability to work/teach three days per week on campus.  Indeed, the "accommodation" he specifically sought was to be able to maintain a schedule that allowed him to work/teach on campus three days each week and to determine at his discretion where the balance of the work-week would be accomplished, i.e., on or off campus.  Additionally, during this reportedly most stressful period, he admittedly taught a workshop for the College's Office of Life Learning, served as a councilman for Trafford Borough, engaged in family and social outings, and spent hours, including weekends, working on the project assigned to him in the ITS Department as well as on course development, research and writing for the ITL Department.  These facts simply do not support a claim that Plaintiff's

thinking was substantially impaired by his agoraphobia/panic attacks or any other condition.  Nor

do these facts suggest that he was substantially limited in his ability to interact with others.[8]

Plaintiff's only "limitation" appears to be his professed inability, or as W&J puts

it, his unwillingness,  to work on campus more than three days a week routinely, which does not

constitute a major life activity.[9]  Importantly, there is no explanation why Plaintiff's

agoraphobia/panic attack disorder or any other condition(s) would substantially limit his ability

to think and interact with others if he had to be physically present on campus four or five days

each week when this same disorder would not -- and clearly did not -- affect his ability to think

and interact with others three days a week.[10]

---

[8]     Plaintiff argues that the court may not examine or focus on these activities because the measure of substantial limitation under the ADA is what a plaintiff confronts and not what he has accomplished.  Emory, 401 F.3d at 181 ("[T]he focus is not on whether the individual has the courage to participate in the major life activity despite [his] impairment, but, rather, on whether [he] faces significant obstacles when [he] does so."(citation omitted)).  Unlike the plaintiff in Emory, whose cerebral palsy and resulting mental and physical deficits were significant, patent and static every day, Plaintiff's panic attack disorder, while chronic, manifests itself at unpredictable times and at varying levels of intensity.  Because "[a]n individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person," Toyota, 534 U.S. at 199, it is appropriate for the court  to consider the above-noted activities.

[9]     Plaintiff does not claim to be substantially limited in his ability to work.  Nor could he succeed on such a claim if he is only restricted from a particular job.  See 29 C.F.R. § 1630.2 (the individual must be excluded from a class of jobs or a broad range of jobs).

[10]    Plaintiff concedes that his alleged difficulty in traveling outside his home without a family member being present does not come into play here since generally his wife, or another family member, drove him to campus every day and waited on campus to drive him home away.  Moreover, he acknowledges that this travel difficulty is unrelated to his ability to perform the essential functions of his Associate Professor position.  Indeed, even an inability to commute does not constitute a substantial limitation of a major life activity.  See, e.g., Dicino v. Aetna U.S. Healthcare, 2003WL21501818, at *15 (D.N.J. June 23, 2003)(finding no duty to accommodate request for at-home assignment or shorter commute because request "goes directly to plaintiff's ability to get to and from her work location, having nothing to do with her ability to perform her job duties once she got to where she needed to be").

Viewing the evidence in the light most favorable to the Plaintiff, no reasonable jury could find that Plaintiff was substantially limited in a major life activity. Accordingly, he has failed to establish that he is a disabled individual within the meaning of the ADA and summary judgment should be entered in favor of the Defendant.

As W&J suggests, if, indeed, Plaintiff were substantially limited in his ability to engage in the major life activities of thinking and interacting with others, then he would not be otherwise qualified to perform the essential functions of his position. Certainly there can be no argument that the abilities to think and interact with others are essential to the position of Associate Professor. Thus, if Plaintiff were substantially limited in these abilities, he would be unable to satisfy the prerequisites of the Associate Professor position and to perform the essential functions of the position with or without reasonable accommodation. Accordingly, summary judgment in favor of the College would be properly entered. Gaul v. Lucent Technologies, 134 F.3d 576 (3d Cir. 1998).

2.   Claim of Interference with FMLA Protected Rights[11]

Plaintiff claims that W&J interfered with his right to family medical leave by denying him leave during the Spring term, failing to grant him provisional leave pending a second opinion from Dr. Schmieler, discouraging him from using FMLA leave, and by discharging him because he was unable to report to work due to a serious health condition.[12] The College argues that Plaintiff cannot demonstrate that he was entitled to leave under the FMLA.

---

[11]      See First Amended Complaint, Count I (FMLA Interference).

[12]      Plaintiff's Brief in Support of Motion for Partial Summary Judgment, p. 2 (Doc. 31).

Under the FMLA, eligible employees are entitled to up to twelve weeks of unpaid leave per year because of, *inter alia*, a "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D). " 'Disability' under the ADA and 'serious health condition' under the FMLA are distinct concepts and require different analyses.  See 29 C.F.R. § 825.702(b)(2000)."  Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.12 (4th Cir. 2001). [13]

To prove an interference with an entitlement claim under the FMLA a plaintiff must show (1) he is an eligible employee, (2) the defendant is an employer subject to the requirements of the FMLA, (3) the plaintiff was entitled to leave under the FMLA, (4) he gave notice to the defendant of his intention to take FMLA leave, and (5) the defendant denied him the benefits to which he was entitled under the FMLA.  Parker v. Hahnemann University Hosp., 234 F.Supp.2d 478, 483-83 (D.N.J. 2002).  Under this theory, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them.  29 U.S.C. §§ 2612(a), 2614(a); Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005).  An entitlement action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.  Callison, supra at 119-120.

Here there is no dispute that Plaintiff was an eligible employee, that W&J was subject to FMLA requirements and that Plaintiff requested family medical leave.  The College asserts that Plaintiff's entitlement theory must fail, however, because he was not entitled to

---

[13]    "Serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves - - **(A)** inpatient care in a hospital, hospice, or residential medical care facility; or **(B)** continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  In turn, "continuing treatment by a health care provider" includes, *inter alia*, a period of incapacity of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, and any period of incapacity or treatment for such incapacity due to a chronic serious health condition.  29 C.F.R. § 825.702(b).

FMLA benefits since (1) he did not have a serious health condition that caused him to be unable to perform the functions of his position and (2) he had received all of the FMLA leave to which he was entitled.

W&J appears to concede that Plaintiff could establish that he had a "serious health condition" within the meaning of the FMLA.  However, W&J argues that the condition did not cause him to be unable to perform the functions of his position.

At the conclusion of the Intersession (January 2004), Plaintiff submitted medical certificates for family medical leave due to reported exacerbation of his medical conditions from his inability to cope with chronic stress which Plaintiff had previously attributed to his immediate supervisor, Dr. Hannon.   Because Plaintiff had made Dean Dlugos aware of the stress Plaintiff was under, the Dean considered finding a solution whereby Plaintiff would report to someone other than Hannon, thereby alleviating his stressful environment and allowing him to continue to work.  Plaintiff agreed  that removing him from the stressful work environment that was exacerbating his medical condition(s) would suffice to allow him to return to work.  The Dean offered a temporary transfer to the ITS Department and Plaintiff accepted the position.

A few days later, however, Plaintiff submitted a letter to Gorman in HR which requested "a three day on campus work/teaching schedule with all other work/teaching days (on and off campus) to be determined at my discretion as I work to schedule and fulfill other college duties and work."  Lloyd Dep., Exh. 33.   Defendant argues that through this letter Plaintiff indicated a then present ability to perform the functions of his position, on and off campus. Plaintiff now insists that the accommodation requested in his letter was meant to be applied **after** he returned from Spring term sick leave.  The evidence of record overwhelmingly supports Defendant's position.

The day after penning his formal ADA accommodation letter, Plaintiff e-mailed Gorman that he was reporting to work in the ITS Department "against medical advice" and would continue to do so "until one of two scenarios occur [*sic*].  One scenario is that I am placed in a structure in which I can teach and report to someone outside of ITL in order to attempt [*sic*] be at work without the work stress... .  The other scenario is that I am correctly placed on sick leave under the short-term policy of the school."[14]  The implication was that he could perform the functions of his position if allowed to report to someone other than Hannon but, otherwise, Plaintiff could not function under the stress created by Hannon and needed to be placed on leave.

Further to this point, the physician who performed an independent medical examination at the request of the College reported that Plaintiff told him (Dr. Schmieler) that he (Plaintiff) felt he was able to resume his previous schedule working only three days per week. As a result, Dr. Schmieler determined that Plaintiff should be considered for extended medical leave only if the College was unable to grant the request to work only three days per week.  The clear import was that Plaintiff could perform the functions of his position if allowed to work a reduced schedule but, otherwise, he could not function under the stress created by working more days on campus.

When some confusion ensued over whether Plaintiff's statements to Dr. Schmieler meant that Plaintiff could work only three days per week (part-time) or three days per week on campus (full-time), Plaintiff wrote to the physician, asking him to send a letter to W&J to clarify that "my statements have been that I can go back to trying 3 days a week (set) - but only for teaching (not another position) and that I wish to continue to do my other work at home ... still a full work week... .  I desperately need to be on short-term medical leave **if they cannot do**

_____

[14]      Dlugos Dep., Exh. 36.

**this**."[15]  Plaintiff's own statements reflect that he could perform the functions of his positions with the immediate accommodation of a reduced on-campus schedule.

After the College denied his request to resume his teaching post with only three days on campus per week, Plaintiff rejected the College's offer to continue working in the administrative position in ITS on a Monday-Wednesday-Friday schedule and exclaimed that during February and March he had been diligently working in his ITS position as well as on other matters, such as course development, research and writing, and teaching a workshop, and that he would continue to work five days per week in the ITS position.  Again, by his own report, Plaintiff was capable of and, indeed, was performing the functions of several positions. Accordingly, no reasonable juror could conclude that Plaintiff had  a serious health condition that caused him to be unable to perform the functions of his position.  Therefore, Plaintiff was not entitled to FMLA benefits.

W&J argues that even if the court were to conclude that Plaintiff was entitled to FMLA leave because he had a serious health problem that caused him to be unable to perform his work, he could not establish a violation of the FMLA because he had exhausted his rights under the Act.

The FMLA guarantees qualified employees 12 weeks of unpaid leave each year. 29 U.S.C. § 2601, et seq.  Between December 1, 2003 and April 5, 2004, Plaintiff took a total of 14.2 weeks of paid leave.  Stated differently, he took leave in excess of the 12 weeks of unpaid leave to which he was entitled under the FMLA.  Under the FMLA it is clear that an employee cannot recover on an FMLA claim where the employee would be unable to return to work at the end of the 12 weeks of protected leave.  Fogleman v. Greater Hazelton Health Alliance, 122 Fed.

---

[15]     Defendant's Response to Counter Statement of Facts in Opposition to Defendant's
         Motion for Summary Judgment, Exh. 2 (Doc. 45)(emphasis added).

Appx. 581, 587 (3d Cir. 2004)(denying FMLA claim where plaintiff was unable to return to position without reasonable accommodation at end of 12 weeks of leave); Cehrs v. Northeast Alzheimer's Research Center, 155 F.3d 775 (6th Cir. 1998). Here, Plaintiff took over 14 weeks of leave before his effective resignation. As such, even if he were entitled to FMLA leave, he refused to return to work after exhausting in excess of 12 weeks of leave.[16] Plaintiff does not respond with any authority to the contrary.

Instead, Plaintiff raises several general challenges to Defendant's assertion that he had exhausted his leave. Plaintiff contests W&J's calculation of the amount of leave taken. HR Specialist Kathleen Viazanko ("Viazanko") prepared a record of Plaintiff's family medical leave taken between December 1, 2003 and April 5, 2004. Plaintiff's hearsay/evidentiary objection to any reliance on this record, which appears to qualify as a business record, is without merit. Federal Rules of Evidence 803(6).

Next, Plaintiff argues that Viazanko's calculations are incorrect since Plaintiff was at work on many of the dates she lists him as being on leave. His reliance on his ITS supervisor, Dan Faulk, in support of this assertion is of little assistance. According to Faulk, between February 9, 2004 and March 18, 2004, Plaintiff was on campus for approximately 115 minutes. Deposition of Daniel Faulk, Exh. 34. Further, Plaintiff's own assertions concerning dates on which he was at work do not serve to create a genuine issue of material fact since he admits that he did not keep precise records of his attendance. Lloyd Decl., ¶ 48.

Equally unavailing is Plaintiff's assertion that W&J failed to select a particular basis for calculating leave, e.g., rolling calendar, fiscal year calendar, etc., and thus he may

---

[16] Moreover, it would seem that any grant of an entire semester as leave would exceed twelve weeks in and of itself. We note that the current Spring term at W&J lasts one day short of thirteen weeks. See www.washjeff.edu/uploadedFiles/Academic_Affairs/Academics/Deans_Office/Academic%20Calendar%202006-2007%20App.pdf.

choose the method most beneficial to him under 29 C.F.R. § 825.200(e) .[17]  The Staff Handbook states that leave is calculated on a "rolling" calendar.[18]  Gorman's Affidavit indicates that leave is calculated on a "rolling" calendar.[19]  Plaintiff's claim that W&J changed the method from rolling to fiscal without providing notice as required by the FMLA is simply not supported by the evidence of record.  Gorman testified that how leave is calculated is found in the staff manual and that the College had not changed that method.[20]  Moreover, even if Plaintiff could somehow choose the calendar year method, he would have used 12.2 weeks of leave between January 8, 2004 and April 5, 2004, that is, in excess of the 12 weeks of leave protected under the FMLA.  Accordingly, summary judgment is properly granted in favor of the College on Plaintiff's FMLA interference claim.

3.    <u>Discrimination and Retaliation Claims</u>[21]

Federal courts analyze discrimination[22] and retaliation claims under the ADA and FMLA using the same framework employed for discrimination and retaliation claims under Title VII.  <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 500 (3d Cir. 1997)(ADA); <u>Chruchill v. Star Enterprises</u>, 183 F.3d 184, 193 (3d Cir. 1999)(FMLA).  The framework, established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), has three steps.  First, the plaintiff

---

[17]    29 C.F.R. § 825.200(e) provides in part that, "If an employer fails to select one of the options in paragraph (b) of this section for measuring the 12-month period, the option that provides the most beneficial outcome for the employee will be used."

[18]    Gorman Dep., Exh. 4 at Section 5.1.

[19]    Gorman Aff., ¶ 3.

[20]    Gorman Dep., p. 285.

[21]    <u>See</u> First Amended Complaint, Count II(FMLA Retaliation); Count IV (ADA Retaliation); and Count VII (PHRA Retaliation).

[22]    Even if the court were to find that Plaintiff is disabled within the meaning of the ADA, which we have found he is not, this section is equally applicable to his claim of discrimination on account of a disability and that claim is properly dismissed as well.

must produce evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a *prima facie* case.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  As discussed, a *prima facie* case of discrimination requires a showing that (1) Plaintiff belongs to a protected class; (2) he was qualified for the position; (3) he was subjected to an adverse employment action despite being qualified; and (4) the adverse job action occurred under circumstances that give rise to an inference of discrimination.  Sarullo v. United States Postal Service, 352 F.3d 789, 797-98 (3d Cir. 2003).

The term "adverse employment decision" includes refusing to make reasonable accommodations for a plaintiff's disabilities.  Williams, 380 F.3d at 761.  An employer discriminates against a qualified individual when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of the otherwise qualified individual with a disability" unless the employer can demonstrate that the accommodation would impose an undue hardship.  42 U.S.C. § 12112(b)(5)(A).  "Reasonable accommodation"  means measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9)(B).

In order to show that an employer failed to reasonably accommodate an employee's disabilities, the employee must demonstrate:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employers' lack of good faith.

Taylor, 184 F.3d at 319-20.  There is no dispute here that W&J eventually learned of Plaintiff's

illnesses.[23]  Nor is there any dispute that Plaintiff requested accommodations for his alleged

disabilities.  The dispute here centers on whether the College made a good faith effort to

accommodate Plaintiff.

       The evidence reflects that Plaintiff requested family medical leave for the

Intersession period (January 2004) due to severe anxiety, depression, chronic fatigue, profound

sensitivity syndrome and neurodermatitis, all reportedly stress induced.  The evidence also

reflects that W&J granted this request.

       Further, during his Intersession leave, Plaintiff complained that his medical

problems were being exacerbated by the stress of working under Hannon and that Plaintiff

needed to resolve this situation or leave W&J.[24]  In response, the College accommodated Plaintiff

---

[23]    It is abundantly clear, however, that Plaintiff did not advise W&J of his
agoraphobia/panic attack disorder and fibromyalgia, or any other illness, at the time that
he applied for a faculty position at the College, nor at any time during his first year in the
Associate Professor position.  Plaintiff claims he advised Hannon of his medical
conditions sometime after the evaluation process.  In any event, at least as of late
November, 2003, when Plaintiff requested leave for the Intersession term due to severe
anxiety and depression with stress, chronic fatigue, profound sensitivity syndrome, and
neurodermatitis, W&J had notice of at least some of his alleged disabilities.

[24]    Plaintiff now asserts that he never told the College that he could not work with Hannon
and never said that he wanted Hannon removed as Chair of the department, only that he
wanted Hannon to stop discriminating against and harassing Plaintiff because of his need
for a flexible schedule due to his disabilities.  Lloyd Declaration ("Lloyd Decl."), ¶ 38.
This declaration, however, does not negate his previous admission that Dr. Hannnon was
the source of his stress.  See Lloyd Dep., Exh. 25 ("[I]f [Hannon] remains in a position to
create great stress as Chair of the department, I will be required, medically, to discuss my
departure."); Lloyd Dep., Exh. 31 (admitting to Gorman that the Dean's solution to have
Plaintiff report to someone other than Hannon "would suffice for now and ... would
remove me from the clear stressful intentions of [Hannon]."). Moreover, the evidence
clearly demonstrates that Plaintiff's stress level rose after Hannon instituted his on-
campus presence policy, which required ITL faculty to be on campus four days a week
for at least four hours each day.  This policy, however, applied to **all** faculty in the ITL
department, not just to Plaintiff.  Thus, it is difficult to understand how this policy
constituted discrimination against the Plaintiff.

by temporarily reassigning him away from Hannon.[25]  Additionally, when Plaintiff asked to be

accommodated further on Tuesday and Thursdays, that is, days he would be expected to be at

work in this temporary position, so that he could attend doctor appointments, the College

accommodated Plaintiff, advising that he could report to work before or after these

appointments.[26]

    Plaintiff's main complaint here is that the College did not accommodate what he

claims was his one and only request: for family medical leave for the entire Spring term followed

by permission to return to a flexible three-day per week teaching schedule.  We examine this

claim against the factual background established by the evidence of record.

    It is undisputed that Plaintiff requested family medical leave for the Spring term.

It is clear, however, that subsequent to this request Plaintiff acknowledged that he could return to

work if removed from his stressor.  The College then offered Plaintiff the temporary

administrative position, which removed him from his admitted stressor, Hannon.  As the College

points out, an employer may provide an accommodation that requires the employee to remain

employed.  For example, an employer may offer a temporary transfer despite an employee's

---

[25]  As W&J points out, the Third Circuit has held that an employer is not obligated to
transfer an employee away from those in the workplace who create a stressful
environment.  Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 581 (3d Cir. 1998)
(Finding unreasonable as a matter of law a request to be transferred away from
individuals who caused the plaintiff "prolonged and inordinate stress [.]  Gaul is
essentially asking this court to establish the conditions of his employment, most notably,
with whom he will work.  However, nothing in the ADA allows this shift in
responsibility.  Indeed, nothing in the law leads us to conclude that in enacting the
disability acts, Congress intended to interfere with personnel decisions within an
organizational hierarchy.  Congress intended simply that disabled persons have the same
opportunities available to them as are available to nondisabled persons." (internal
quotations and citations omitted)).  This court agrees with W&J that it went beyond what
the ADA requires when it transferred Plaintiff away from Hannon who, by Plaintiff's
own admissions, was the source of his stress.

[26]  It appears that his pay was not affected as a result of this transfer.  Gorman Dep., p. 272;
CSOF, ¶ 126.

request for leave as an accommodation.  See EEOC Enforcement Guidance: Workers'

Compensation and the ADA, No. 915.002 (September 3, 1996), at p. 18: EEOC Enforcement

Guidance on Reasonable Accommodation and Undue Hardship, No. 915.002 (March 1, 1999).

Moreover, an employee cannot make his employer provide a specific accommodation if another

reasonable accommodation is instead provided.  42 U.S.C. § 12111(9)(B); 29 C.F.R. §

1630.2(o)(2)(ii); Hedrick v. Western Reserve Care System, 355 F.3d 444, 457 (6th Cir. 2004).

Further, the record reflects that after the College accommodated Plaintiff's request

for relief from his stressful environment, Plaintiff made a request for an accommodation

consisting of the following:

> Although the possibility for this accommodation request has been
> discussed verbally, this letter serves as my written request for an
> accommodation under ADA Title I.  This request should not have
> been necessary because the same conditions requested in this letter
> already exist in the addendum to my contract from 2002.
>
> Due to my documented disabling conditions (prior and present), I
> hereby request an accommodation in the form of a three day on
> campus work/teaching schedule with all other work/teaching days
> (on and off campus) to be determined at my discretion as I work to
> schedule and fulfill other college duties and work.  I am hoping
> that this request will not be a problem because it is widely known
> that the faculty at W&J already work under these conditions –
> faculty without severe health difficulties.
>
> If there are any questions concerning this request or any further
> information is needed, please contact me in writing.

Lloyd Dep., Exh. 33.[27]  Nothing in this request speaks to the chronology Plaintiff claims, i.e., that

this accommodation was to be effectuated after he returned from medical leave.

---

[27]     As noted earlier, there is no explanation in the record from Plaintiff or his physicians
why his medical condition(s) allowed him to work three days on campus yet generally
precluded him from spending more than three days on campus and yet did not affect his
ability to put in a fourth or fifth day when necessary.

Plaintiff argues that W&J has offered no explanation for why he was not permitted the reduced schedule in his teaching position since that is the schedule Dlugos approved before Plaintiff was hired.  The problem with this argument is that no such approval ever occurred.  Although Plaintiff wrote to Dlugos prior to Plaintiff's start-date at W&J and set forth his "expected schedule and contribution," Plaintiff admits that he never advised Dlugos or anyone else at the College that he required this schedule because of his disabilities.  Moreover, Dlugos testified that Plaintiff's requested schedule  was not made part of his employment contract since neither the Dean nor Plaintiff signed off on what Plaintiff refers to as the "addendum" to his contract.  Plaintiff has offered no evidence to contradict the Dean's testimony, as is Plaintiff's burden, in order to create an issue of material fact.[28]

In fact, Plaintiff's reduced schedule during his first year was permitted, *inter alia*, so as to enable him to focus on developing new courses for the ITL.[29]  By the Spring of 2004, Plaintiff was well into his second year of a three-year tenure track.  As the College explained, a tenured professor on a shortened tenure track simply could not meet his obligations on the schedule Plaintiff proposed.[30]  In response, Plaintiff has offered argument, not facts, which is insufficient to defeat summary judgment.

Reduced to its essence, Plaintiff's complaint is that the College did not provide him with the accommodation he wanted, that is, the Spring semester off.  However, "an employer

---

[28]     Although Plaintiff may believe that his request became part of the contract, his own belief does not create an issue of material fact.

[29]     Lloyd Dep., Exh. 5.

[30]     These responsibilities included, *inter alia*, teaching up to seven courses annually as assigned by the Chair of the department, preparing for classes, mentoring students, holding regular office hours, attending departmental and faculty meetings, developing new courses, conducting research and writing, and participating in recruitment activities and in the intellectual, cultural and social life of the College.  Lloyd Dep., Exh. 4; see Hannon Dep., pp. 87-88; Gorman Dep., pp. 165-66 & 178; Dlugos Dep., p. 215.

is not obligated to provide the employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." EEOC v. Yellow Freight System, Inc., 253 F.3d 943, 951 (7th Cir. 2001)(internal quotation marks and citations omitted). "The interactive process does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions. All the interactive process requires is that employers make a good-faith effort to seek accommodations." Taylor, 184 F.3d at 317 (citation omitted).

Viewing the evidence in the light most favorable to the Plaintiff, the evidence overwhelmingly establishes that W&J reasonably accommodated all of Plaintiff's requests and no reasonable jury could conclude otherwise. Accordingly, Plaintiff has failed to establish his *prima facie* case of discrimination and summary judgment in favor of the College should be entered.

To establish a *prima facie* case of retaliation under the anti-discrimination statutes, a plaintiff must establish that (1) he engaged in activity protected by the statute, (2) the employer took action that a reasonable employee would have found to be materially adverse in that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination; and (3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006). Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity he opposes is unlawful under Title VII. Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001) (per curiam).

Nevertheless, " '[t]he ultimate question in any retaliation case is an intent to retaliate *vel non*.' " Moore, supra (citation omitted).

  Assuming *arguendo* that Plaintiff could succeed in establishing a *prima facie* case of discrimination or retaliation, the burden of production (but not the burden of persuasion) shifts to the Defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge.  St. Mary's Honor Center, 509 U.S. at 506-07.  If the Defendant cannot satisfy this burden, judgment must be entered for the Plaintiff.  Id. at 509.  On the other hand, if the Defendant does satisfy this burden, step three is reached and the Plaintiff may then survive summary judgment or judgment as a matter of law by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994).  Accord Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir.1996) (en banc).

  In order for a plaintiff to refute the employer's articulated reason for the employment decision, the plaintiff must submit specific evidence that the employer's proffered reason is untrue.  The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence."  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997)(citing Fuentes, 32 F.3d at 765).  Importantly, a plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong it cannot have been the employer's real reason."  Id. at 1109.  As the Third Circuit has explained, a plaintiff's "evidence must be enough to support a <u>reasonable</u> inference that the reasons given for the employment decision are

pretextual.  Merely reciting that [discrimination or retaliation] was the reason for the decision does not make it so."  Billet v. CIGNA Corp., 940 F.2d 812, 816 (3d Cir. 1991), overruled in part on other grounds by St. Mary's Honor Center v. Hicks, supra.

Assuming *arguendo* that Plaintiff could establish a prima facie case, the College argues that Plaintiff has not succeeded in refuting its articulated, non-discriminatory, non-retaliatory reason for its employment decisions.  We agree.

In order to show pretext, Plaintiff must show that his "disability" was a "determinative factor" in W&J's decisions.  "'Determinative factor' means that 'but for' the plaintiff's protected status the adverse employment action would not have occurred."  Wimberly v. Severn Trent Services, Inc., 2007WL666767, at * 3 (E.D.Pa. Feb. 26, 2007)(citing Watson v. SEPTA, 207 F.3d 207 (3d Cir. 2000); Billet v. Cigna Corp., 940 F.2d 812 (3d Cir. 1991).

As has been discussed at length, Hannon suggested that Plaintiff increase his visibility or availability on campus to further the efforts of the ITL Department and Plaintiff's tenure opportunity.  Later, Hannon established a policy for all full-time ITL faculty requiring them to be on campus at least four days each week in order to further the objectives of the new ITL Program.  Plaintiff concedes that any discussions and decisions in this regard were not related to any discussion concerning his medical condition(s).  Lloyd Dep., Ex. 24.

With regard to Plaintiff's numerous and varied requests for leave and accommodations, again, as we have discussed, the College (1) granted his request for family medical leave during Intersession, (2) formulated a plan to remove him from the admitted stressor in his work (Hannon), which Plaintiff agreed would suffice, (3) accommodated his request to be able to attend to doctors' appointments, (4) sent him for an independent medical evaluation, as was their right (which Plaintiff does not dispute), to ascertain the precise status of his ability to continue working in some capacity after Plaintiff submitted conflicting requests, and

(5) offered him the reduced schedule he requested, albeit in the temporary administrative position and not in the faculty position, with no change in salary.  Plaintiff has offered no evidence that any one of these decisions was motivated by discriminatory or retaliatory motive or was a pretext for discrimination or retaliation.  Instead, Plaintiff offers selective "facts," many of which are not supported by the record, and conclusory statements.

Plaintiff claims, for example, that three months after he requested reasonable accommodations and/or FMLA-protected leave he was "discharged" when he could not report to work due to illness.  In fact, as discussed at length, the College accommodated Plaintiff's changing requests and lastly offered him a Monday-Wednesday-Friday on campus schedule -- an accommodation he requested.  Plaintiff was instructed that if he accepted this accommodation he was to report to the ITS supervisor, Daniel Faulk, on April 5, 2004, or the College would presume that he was resigning.  Plaintiff did not report as instructed.  He did not telephone Faulk or any other individual at the College to report any illness that day, as any reasonable employee would have done.  Instead, he sent an e-mail to Dlugos with a copy to Faulk, indicating that he had unspecified "therapy" that morning, which he presumably knew about in advance of April 5th, and stated that he should be at work that afternoon "depending on how I am feeling."  Dlugos Dep., Exh. 54.  Further, notwithstanding the express conclusion W&J had indicated it would draw if he failed to report to work on April 5th, Plaintiff chose not to report to work or otherwise contact the College subsequent to his e-mail message to indicate that he was unable to report to work due to any illness or medical condition(s).  As such, no reasonable jury could conclude that W&J's decision to treat Plaintiff's failure to report to work as a resignation was motivated by discriminatory or retaliatory motives or was a pretext for discrimination or retaliation.

Plaintiff references certain remarks allegedly made by Dlugos, Hannon, Faulk, and Gorman as evidence of discriminatory or retaliatory intent.  Specifically, Plaintiff claims that in April of 2003, when Hannon implemented the ITL Department policy requiring four days per week to be spent on campus, he indicated he did not care about Plaintiff's health problems.  CSOF, ¶ 283.  As well, Plaintiff attributes to Hannon the statement, "I don't give a shit about your health problems," made on another occasion, date unspecified.  CSOF, ¶ 284.  Plaintiff also claims that at a meeting on an unspecified date during the Spring term Faulk also told Plaintiff that he did not "give a shit" about Plaintiff's health.  Lloyd Decl. ¶ 49.

Plaintiff claims that Gorman referred to his physicians as "Mickey Mouse" during a conversation he and Gorman had concerning the information his physicians provided in January, 2004, in connection with his request for leave for the entire Spring term.

Additionally, Plaintiff attributes to Dlugos three statements.  First, the Dean reportedly told Plaintiff that "being sick is no excuse" when he complained about being "forced to work against doctors' orders."  See Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, p. 22 (Doc. 38).  Second, Plaintiff claims that the Dean told him a "termination story"[31] in an effort to intimidate him from pursuing a flexible work schedule because of his disabilities.  Third, Plaintiff alleges that the Dean told him he (the Dean) planned to "discharge" Plaintiff before he (the Dean) left W&J.

Statements or comments by others in the workplace may demonstrate discriminatory intent.  In evaluating this type of evidence, the court is required to distinguish between those statements that are truly evidence of the employer's intent and those that are merely "stray remarks."  See e.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J. concurring)(observing that mere "stray remarks" do not constitute direct evidence

---

[31]     Plaintiff has not recounted any details of the "story."

of discrimination "[n]or can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself.").

In general, courts have outlined several factors to determine "whether a comment is a probative statement that evidences an intent to discriminate or whether it is a 'stray remark.'" Pronin v. Raffi Custom Photo Lab., Inc., 383 F.Supp.2d 628, 637-38 (S.D.N.Y. 2005).  The relevant factors are:

> (1) who made the remark, i.e., a decision-maker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decision-making process.

Pronin, supra at 637 (citations omitted).  Even stray remarks that are made by decisionmakers but that are unrelated to the decision-making process, "are rarely given weight, particularly if they are made temporally remote from the date of the decision." Silver v. American Institute of Certified Public Accountants, 2006 WL 3511342, at * 2 (3d Cir., Dec. 6, 2006)(citing Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)).

Applying these factors to the remarks at hand, and assuming *arguendo* that the above mentioned remarks were made, there is no evidence that Hannon had any decision-making role concerning any of the complained of adverse employment actions.[32]  Moreover, at least one of the remarks attributed to Hannon was made some nine months prior to any of the alleged adverse actions, and there is no indication when the other statement was made.  See Pronin, supra at 638 (statement made by non-decisionmaker six to eight weeks before plaintiff was fired was "a non-probative stray remark").  Similarly, there is no evidence that Faulk had any role in the

---

[32]     Those actions are: (1) failure to grant Plaintiff's request for medical leave for the entire Spring term: (2) failure to accommodate Plaintiff's request for accommodations; and (3) terminating Plaintiff for failing to report to work on a day when he was ill.

decisionmaking processes here.  Nor is there any context provided by which this court might properly assess the remark attributed to Faulk   As such, the remarks are clearly "stray remarks" and cannot serve to evidence discriminatory intent or pretext.  See, e,g,, Ramirez Rodriguez v. Boehringer Ingleheim Pharmaceuticals, Inc., 425 F.3d 67, 84 (1st Cir. 2005)(statements made by non-decisionmakers or individuals not involved in the adverse employment action in question are insufficient to establish discriminatory animus); Del Franco v. New York City Off Track Betting Corp., 429 F.Supp.2d 529 (E.D.N.Y. 2006)(comment by branch manager that 63 year old employee did not need her job because she could live off her social security, not direct evidence of discrimination because branch manager not involved in personnel decision).[33]

As concerns the statements attributed to Gorman and Dlugos, who are presumed to be decisionmakers here, the statements are ambiguous at best and offered without any surrounding context from which the court could discern any intent, discriminatory or otherwise. See Roberts v. GHS-Osteopathic Inc.-Parkview Hospital, 1997WL338868, at * 8 (E.D.Pa. June 19, 1997)(ambiguous remark, "[t]his wouldn't have happened if not for [the] Spanish language," not sufficient to establish prima facie case); Ross v. Arcata Graphics Co., 788 F.Supp. 1298, 1303 (W.D.N.Y. 1992)(ambiguous remark, '[y]ou know what they say about Germans," not enough to avoid summary judgment burden on national origin claim).  Moreover, Plaintiff asks

---

[33]     At times, courts have found that comments made by non-decisionmakers may be used to build a circumstantial case of discrimination, where they demonstrate a general atmosphere of discrimination.  See, e.g., Lockhart v. Westinghouse Credit Corp., 879 F.2d 43 (3d Cir. 1989)(admitting executive statements because they "reflected cumulative managerial attitude that had been held for a considerable time"); Malarkey v. Texaco, Inc., 983 F.2d 1204, 1210 (2d Cir. 1993)(statement by non-decisionmakers were properly received "because they showed the pervasive corporate hostility towards [plaintiff] and supported her claim that she did not receive a promotion due to her employer's retaliatory animus"); Warren v. Halstead Industries, Inc., 802 F.2d 746, 753 (4th Cir. 1986)(evidence of a "general atmosphere of discrimination," harassment, or threats is "relevant to the determinations of intent and pretext").  However, such circumstances simply do not exist in this case.

the court to view these "stray remarks" in isolation and, indeed, without regard to the entire on-going series of events that was unfolding from December 2003 to April 5, 2004.

While Plaintiff may disagree with W&J's decisions or believes them to have been unreasonable or undesirable, this disagreement does not establish discrimination or retaliation. "[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. As W&J points out, the Third Circuit has long emphasized that in the absence of evidence indicating that an employer acted with specific discriminatory intent, managerial decisions should not be second-guessed under the cover of employment discrimination laws. Id.

Viewing the evidence in the light most favorable to Plaintiff, the court finds that there are no material facts in dispute such that a reasonable jury could conclude that Plaintiff was discriminated or retaliated against under the ADA or the FMLA.

4.      State Law Breach of Contract Claim

The rule in the Third Circuit is that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (1995)(citations omitted). Here, considerations of judicial economy, convenience and fairness to the parties weigh in favor of the district court exercising its discretion to refrain from hearing the state law claims since the central questions in Count V involve purely matters of state law. Needless decisions of state law are to be avoided as a matter of comity. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726-27 (1966).

For these reasons, it is recommended that Defendant's Motion for Summary Judgment be granted and Plaintiff Motion for Partial Summary Judgment be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/   *Amy Reynolds Hay*
AMY REYNOLDS HAY
United States Magistrate Judge

Dated: 26 March, 2007.

cc:   Hon. Terrence F. McVerry
United States District Judge

All counsel of record via Notice of Electronic Filing

38